Breitel, J.
Defendant appeals from a conviction for robbery in the second degree and related crimes and a sentence to State prison for 15 to 20 years. Following a posttrial hearing on the voluntariness of his confessions, obtained in a proceeding brought by defendant in the nature of a writ of error coram nobis, the trial court held that the statements were voluntary. The Appellate Division affirmed the conviction, and also the denial of coram nobis relief on the basis of People v. Bodie (16 N Y 2d 275), holding that while most of the statements were made in the absence of counsel defendant had waived his right to counsel.
On the present appeal defendant contends that there was error in the admission of some 11 inculpatory statements and that there was further error in the admission upon the trial of testimony by a police officer that the complaining witness had previously identified defendant.
The judgment of conviction and the order in the coram nobis proceeding should be reversed and a new trial granted. The 11 inculpatory statements, made by defendant over the course *562 of three weeks (to a Cheyenne, Wyoming, police officer, an agent of the Federal Bureau of Investigation, several Westchester County Parkway police officers, and an assistant district attorney), were obtained in violation of his constitutional rights and should not have been admitted into evidence. Because of the conceded error in permitting testimony by a police officer concerning a pretrial identification of defendant made by the complainant, a reversal is also required.
Serious questions are raised as to the admissibility of his first three statements, given to the Cheyenne police officer and the F. B. I. agent. Even assuming, however, that their admission was not error, defendant’s last eight statements, given to the New York officials after the filing of an information and the issuance of an arrest warrant, were inadmissible under People v. Bodie (16 N Y 2d 275, supra). This error, as well as the erroneous admission of testimony as to the pretrial identification, requires reversal of defendant’s conviction.
Some seven months after the commission of an armed robbery against a Mr. and Mrs. Bruce in Westchester County, defendant appeared at police headquarters in Cheyenne, Wyoming, requesting a pass, as an indigent, for a free night’s lodging with the Salvation Army. When he made a similar request the next night (Sept. 21, 1961), the police radio dispatcher became suspicious. In response to an inquiry, defendant admitted that he “ could be wanted for questioning ”, and he was thereupon arrested by the “ jailer ” for vagrancy. A Captain Smith was called, and defendant admitted that he might be wanted for questioning in New York on a robbery charge.*
Captain Smith then called in one Harry V. Jones, the resident F. B. I. agent. At about 10 o’clock that night, according to Captain Smith, defendant orally confessed to having committed the robbery, although he refused to sign a statement. (Agent J ones, on the contrary, testified that defendant made no confessions that night, but that defendant stated that if he had commited the crime, he [defendant] would not admit it.)
*563 The next day, the Cheyenne authorities advised the Westchester authorities that defendant had been apprehended, and confirmed that defendant had, indeed, been questioned about the Bruce robbery. That afternoon he was convicted of vagrancy and sentenced to a $50 fine or 50 days, the sentence to be suspended upon completion of investigation on the New York robbery charge.
The interrogation of defendant by Captain Smith and Agent Jones was continued the day after his conviction. Both officers testified that during this questioning, defendant confessed to the robbery.
Defendant testified that prior to the first interrogation session with Agent Jones and Captain Smith, he had requested a lawyer but was told he would have to wait until he got to court. He further testified that he was not given a lawyer during the vagrancy proceedings, and, because of the earlier refusals, did not bother asking for one the second night of interrogation. Captain Smith testified at the posttrial confession hearing that he had offered to supply defendant with a lawyer but defendant had refused to have one. In contrast to his posttrial testimony, at the trial Captain Smith had testified that he had told defendant he could have a lawyer if he paid for one. Agent Jones testified both on the trial and the posttrial hearing that he (not Smith) had advised defendant of his rights and that defendant had made no requests for a lawyer.
Defendant’s claim that he requested a lawyer but was refused is consistent with his later futile attempts to secure his rights. Thus, on September 25, defendant drew up a petition for a writ of habeas corpus, alleging that he was being held on a sham vagrancy charge, that he was being deprived of his rights, and demanding an extradition hearing. He also complained of a stomach illness. Defendant requested that the jailer forward his papers to the Federal District Court in Wyoming. However, the papers remained in the custody of the police, who were unable to explain why they never reached the Federal court.
About a week after ‘ ‘ mailing ’ ’ the petition, defendant sent a letter to Acting G-overnor G-age of Wyoming, this time using a fellow inmate, who was being released, to mail it. In this letter he again requested an extradition hearing. He claimed that he had signed an extradition waiver without the benefit of *564 counsel and while under the influence of compazine, a tranquilizer drug which had been prescribed for him at Laramie County Hospital by a Dr. Klein, who had diagnosed his continuing stomach ailment as an ulcer. He also asserted that he had been told that the extradition-waiver papers were a release of liability for his medical treatment. A reply by the Acting Governor to his letter was received at the jail addressed to defendant. The letter disavowed any circumstances warranting assistance to defendant. It was, however, never received by him personally but remained in the hands of the police authorities.
It is at this time, some two weeks after defendant’s arrest for vagrancy, that the Westchester police came into the picture. Following the communication received from Cheyenne, the Westchester police had continued their investigation. On September 29, Detective Fulgenzi filed an information against defendant and obtained a warrant for his arrest. The detective and Assistant District Attorney Spring arrived in Cheyenne on October 5 and began questioning defendant shortly before noon on October 6. Detective Fulgenzi, who saw defendant alone, testified that at first defendant was very un-co-operative and complained about his stomach ailment and the food he was receiving. He agreed to talk, however, when Detective Fulgenzi promised to get him a roast beef dinner. Defendant then made a full confession to the robbery and told Detective Fulgenzi and Mr. Spring where he had hidden the gun and uniform.
When defendant asked for a lawyer before the interrogation, Detective Fulgenzi answered, “Well, I don’t know any attorneys here, but here is a telephone book. You can look one up.” Defendant responded, “That’s a laugh.” This incident was substantially confirmed by Detective Fulgenzi and Mr. Spring at the trial and by Mr. Spring at the posttrial confession hearing. Defendant also testified to the incident and explained that he said it was a “ laugh” because he had only five cents and could not hire a lawyer. Detective Fulgenzi testified at the posttrial hearing, in partial contradiction of his trial testimony, that he merely asked defendant if he wanted a lawyer, and defendant answered, “ That’s a joke.”
On October 9, Detective Fulgenzi, Assistant District Attorney Spring, Lieutenant McMahon (who had flown to Cheyenne the day before) and defendant boarded a train for the return trip *565 to New York. On the train defendant confessed two more times, and assisted Detective Fnlgenzi in drawing a sketch of the scene of the crime and the location of the hidden gun and uniform. Detective Fnlgenzi testified at the hearing that prior to each interrogation defendant had said he was not interested in having a lawyer.
When they arrived at Harmon station in Westchester County, at about 9:00 a.m. on October 11, defendant was not taken to court because the officers were told there was no Judge available. He was instead driven to various places connected with the robbery, but the officers were unable to find the gun and uniform where defendant had said they had been hidden eight months before. During the drive defendant confessed five more times. He was then arraigned in the White Plains City Court.
The admissibility of the earlier statements, especially of the last of the three, made by defendant to the Wyoming authorities is gravely doubtful. There can be no question that the vagrancy arrest and . conviction were a manipulated pretext (although not a sham) to enable custodial interrogation of defendant concerning the New York robbery charge. Indeed, the punishment given defendant was to be suspended on completion of the investigation of the New York robbery charge. Thus, under People v. Robinson (13 N Y 2d 296, 301) and People v. Davis (13 N Y 2d 690), the vagrancy arraignment was in effect the commencement of criminal proceedings on the robbery charge and no questioning could be conducted concerning the robbery in the absence of counsel, unless waived.
The eight statements made to the New York officers are inadmissible, for more patent reasons, since they were obtained in the absence of counsel after an information was filed in New York and an arrest warrant obtained there, unless it can be said that defendant waived his right to counsel (People v. Bodie, 16 N Y 2d 275, 278-279, supra). Thus in the Bodie case, it was said, “If this case merely contained an inculpatory statement made in the absence of counsel after an information had been filed, we would be compelled to hold that the statement is inadmissible, because no valid distinction may be made between a postindictment and a postinformation statement [citing cases] ” (pp. 278-279).
*566 The dissent raises a question about the retroactivity of the rules applicable to statements made by a nonwaiving, uncounselled defendant after information or indictment and issuance of a warrant. The basic rule excluding certain postindictment statements because formal criminal proceedings had been begun was propounded in the cases of People v. Di Biasi (7 NY 2d 544) and People v. Waterman (9 N Y 2d 561) decided April 1, 1960 and May 18, 1961, respectively. Defendant in this case was arrested in Cheyenne on September 21, 1961, and the New York robbery warrant was issued on September 29, 1961. Hence, there is no issue of retroactivity as to the rule in those cases. People v. Bodie (16 N Y 2d 275, supra), characterized by the dissent as an “ extension ’ ’ of the Di Biasi rule, was decided after the arrest, but is hardly more than an application of the principle already settled, and involved neither an extension of the reasoning nor of the principle, as a mere reading of that opinion establishes. And for that matter, this court had in People v. Meyer (11 N Y 2d 162) excluded a postarraignment, preindictment statement on the basis of the principle in the Di Biasi case (supra), on the ground that an arraignment after arrest must be deemed the first stage of a criminal proceeding. Hence, the Meyer case, decided April 5, 1962, involving inevitably the application of the Di Biasi rule to a preindictment statement, was handed down long before the statements of this defendant were used upon his trial which began in September, 1962. It, therefore, controls and the issue of retroactivity is obviated on this further ground.
Consequently, the issue of waiver of the right to counsel is presented.
The right to counsel before defendant is questioned, after information and warrant proceedings but before arraignment, as here, is not waived where the indigent defendant, an adjudicated vagrant, has only the alternatives of proceeding without counsel or retaining a lawyer from a telephone book in a strange city. That defendant attempted, during his imprisonment in Cheyenne, to obtain assistance from the Federal District Court and the Governor of Wyoming undermines completely a finding that he willingly waived his right to counsel. Thus, before the New York authorities arrived and questioned him, and thereafter, according to their testimony as well as his, *567 he asked repeatedly for a lawyer. The defendant’s “ waiver ” was, therefore, nonexistent. Hence, the eight later statements obtained by the Westchester authorities were inadmissible.
There was also error occasioned by the police officer’s testimony that defendant had previously been identified by the complainant (Code Crim. Pro., § 393-b; People v. Trowbridge, 305 N. Y. 471). Such bolstering testimony is not prejudicial only where the evidence of identity is so strong there is no substantial issue on the point or where an identification has been attacked as a recent fabrication (People v. Caserta, 19 N Y 2d 18, 21-22; People v. Milburn, 19 N Y 2d 910, 911).
The robbery followed the taking on of a hitchhiker by the victim, Mr. Bruce. On a foggy, rainy night, at 11:30, Mr. Bruce stopped his automobile to give a ride to man standing in the road. The man was wearing an Air Force cap pulled low over his face and his Air Force uniform collar- was turned up. The man approached the car from the rear and entered the back seat, so that Mr. Bruce obtained only a glimpse of him. During the robbery Mr. Bruce’s back was turned to the robber in the back seat. After the robbery, when the man left the car, Mr. Bruce had only a second fleeting glimpse of the side of the man’s face. His identification of defendant was, therefore, based on momentary and partial views of the robber.
The subsequent identification in issue was made seven months later and, concededly, defendant’s Boston accent was a persuasive factor in the identification by the victim. (There had also been some police photographs shown to Mr. Bruce, shortly after the robbery, but there is no indication whether defendant’s photograph was among them.) Moreover, Mr. Bruce admitted at trial that he was not sure defendant was the man who robbed him. Nor was there any attempt to attack Bruce’s “ identification ” as a recent fabrication. Thus the improper admission of the officer’s testimony also requires reversal of the conviction.
Moreover, if the inculpatory statements are excluded, as they should be, the identification issue becomes crucial, and the erroneous admission highly prejudicial.
In sum, the findings below that defendant- did not ask for a lawyer or that he waived his right to a lawyer are not supported by the testimony in which defendant and the authorities largely agreed. And, upon the trial, there was gross and preju *568 dicial error in the admission of the identification testimony. ¡Hence, as a matter of law, there must be a reversal of the conviction.
Accordingly, the judgment of conviction and the order entered in the coram nobis proceeding should be reversed and a new trial ordered.

 This statement was, according to defendant, based on the fact that shortly after Mr. and Mrs. Bruce had been robbed, he had been questioned by the Westchester authorities. The robbery had been committed by a hitchhiker wearing an Air Force uniform and defendant had a previous conviction for wearing an Air Force uniform without authority. Hence, the occasion for his being questioned, but he was not detained.